UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:17-cv-477-FDW
(3:12-cr-188-FDW-DSC-2)

| | | |
|---|---|---|
| **ALAN BOYD DONTA BARNETT,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **vs.** | ) | **ORDER** |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Respondent.** | ) | |
| _____ | ) | |

**THIS MATTER** is before the Court on Petitioner's *pro se* Amended Motion to Vacate,

Set Aside or Correct Sentence under 28 U.S.C. § 2255, (Doc. No. 7).

## I.  BACKGROUND

Petitioner was charged in the underlying criminal case along with 27 co-defendants for

their alleged involvement with multiple offenses involving the United Blood Nation ("UBN")

gang. The charges pertaining to Petitioner are: Count (1), conspiracy to participate in racketeering

activity (18 U.S.C. § 1962(d)); Count (2), conspiracy to distribute and possession with intent to

distribute cocaine base (21 U.S.C. §§ 846, 841(a)(1)); Count (3) illegal use of communication

facility (21 U.S.C. § 843(b)); Count (4) distribution of cocaine base (21 U.S.C. § 841(a)(1), 18

U.S.C. § 2);[1] Count (14), conspiracy to commit murder in aid of racketeering activity (18 U.S.C.

§ 1959(a)(5)); and Counts (24), (27), conspiracy to commit Hobbs Act robbery (18 U.S.C. § 1951).

(3:12-cr-188, Doc. No. 280).

---

[1] Petitioner was also charged with distribution of cocaine base in Counts (7) and (8) but these counts were dismissed
on the Government's motion, (3:12-cr-188, Doc. No. 669),

1

Petitioner and co-defendant Samantha Williams proceeded to a joint trial. At the start of trial, the Court asked the parties to place on the record the status of any plea offer. Petitioner's counsel explained in open court that Petitioner had the same offer throughout the case for the RICO charge. Counsel further explained that such a plea was unacceptable to Petitioner because, due to his criminal record and background, there is a possibility that he would be left "facing such a sentence that he may never go home." (Id., Doc. No. 805 at 5). Petitioner initially stated that he did not recall a plea offer, but the following then transpired after a recess:

> MR. ZOLOT: Your Honor, I can – the offer is going to be plead to the RICO conspiracy and stipulate to the cross reference for murder – for conspiracy to commit murder, for drug trafficking over 280 grams of crack cocaine and the two Hobbs Act robberies…
>
> THE COURT: That is the offer.
>
> MR. ZOLOT: That's the offer.
>
> THE COURT: You pulled it off your email.
>
> MR. ZOLOT: That is the offer currently today as we stand here.
>
> THE COURT: Okay. So that is the last offer.
>
> MR. SHELLA: And Judge, I would note after our meeting in July when the court had reset this case, it was June or July, I went back to the jail since my client wasn't brought over. I spoke to him. I relayed to him that they wanted him to plead guilty to the RICO charge. As we sit here right now, he's saying he's not quite sure that he remembers that. But it is his wish to – it was his wish since then to go forward as well.
>
> THE COURT: All right. Mr. Barnett, would you please stand.
>
> So does all of this refresh your recollection –
>
> DEFENDANT BARNETT: Yes, sir.
>
> THE COURT: -- of the event?
>
> So you've heard what Mr. Zolot is offering right now. You have to make the decision whether to accept or reject that.

2

DEFENDANT BARNETT: I reject it.

THE COURT: You reject it.

DEFENDANT BARNETT: Yes, sir.

THE COURT: All right. If you had been given the opportunity merely to plead to the RICO charge, would you have pled to that?

DEFENDANT BARNETT: No, sir.

(Id., Doc. No. 805 at 6-7).

The Government the presented evidence at trial that established the following facts:

UBN was founded in 1993 at Rikers Island Prison in New York City, when two prisoners brought together several smaller groups affiliated with the Bloods gang. UBN originally consisted of eight groups, called "sets," including the Gangster Killer Bloods, commonly known as "G–Shine." J.A. 262. At present, UBN's power structure remains in New York, but its membership has spread to other prisons and communities along the East Coast. The leader, or "godfather," of each set serves on the central council for the gang and directs set leaders in each state. J.A. 263. The gang operates through a hierarchical structure and a strict set of rules.

Defendant Barnett was the second highest ranking member of the G–Shine set in North Carolina. In the G–Shine hierarchy, Barnett was directly under Franklin Robbs, the leader of G–Shine in North Carolina, who in turn reported to Daryl Wilkinson. Wilkinson—also known as "OG Powerful," "Infinity Q45," and by various other names—was the godfather of G–Shine during the relevant time period and was incarcerated in New York.

The government monitored a wiretap on Barnett's phone for roughly 90 days and surveilled Barnett and other UBN members for years. At trial, the government submitted audio recordings of over two dozen calls collected as part of the wiretap. On one of those phone calls, … Barnett and other UBN members discussed a plan for a UBN member to attack an individual named Deray Jackson. Additionally, numerous witnesses, including several UBN members charged as co-conspirators, testified to Barnett's leadership role in G–Shine and his participation in robberies and drug trafficking. Several law enforcement officers also testified regarding instances in which they purchased drugs from Barnett using undercover agents.…..

United States v. Barnett, 660 F. App'x 235, 238–40 (4th Cir. 2016).

3

The jury found Petitioner guilty as charged. (3:12-cr-188, Doc. No. 681).

The presentence investigation report ("PSR") grouped the Counts into four groups pursuant to U.S. Sentencing Guidelines § 3D1.2(d). Group 1, comprised of Counts (1) through (4), resulted in the highest offense level. The base offense level for Group 1 was 34, based on conspiracy to possess or deliver 2.1 kilograms (more than 840 grams but not more than 2.8 kilograms) of crack cocaine. (Id., Doc. No. 909 at ¶ 48). Two levels were added because a weapon was possessed during the conspiracy, two levels were added because Petitioner committed the offense as part of a pattern of criminal conduct engaged in as a livelihood, and four levels were added because Petitioner was an organizer or leader of a criminal activity involving five or more participants or was otherwise extensive. (Id., Doc. No. 909 at ¶¶ 49, 50, 51). This resulted in adjusted offense level subtotal for Group 1 of 42. (Id., Doc. No. 909 at ¶ 53). The total number of units was 1.5 and the greater of the adjusted offense levels was 42. (Id., Doc. No. 909 at ¶¶ 77, 78). The offense level was increased by one, resulting in a combined adjusted offense level of 43. (Id., Doc. No. 909 at ¶¶ 79, 80). In addition, Petitioner qualified as a career offender because the instant offense is a felony crime of violence or controlled substance offense and Petitioner had at least two prior felony convictions for crimes of violence (conspiracy to commit robbery with a dangerous weapon and first-degree burglary). (Id., Doc. No. 909 at ¶ 81). The PSR's criminal history section scored 15 criminal history points and a criminal history category of VI. (Id., Doc. No. 909 at ¶¶ 93-94). In addition, the criminal history category for career offenders is VI. (Id., Doc. No. 909 at ¶ 94). The advisory imprisonment range was life. (Id., Doc. No. 909 at ¶ 140).

Defense counsel filed objections to the PSR challenging, *inter alia*, the amount of drugs for which Petitioner should be held responsible should not exceed one kilo, that the career offender

designation was based on felonies that are not within the applicable time period for counting purposes, and the criminal history points were miscalculated. (Id., Doc. No. 901).

At the sentencing hearing, the Government argued that the crack cocaine amount is supported by the following evidence that was presented at trial:

> [F]rom the recordings, which were Governments Exhibit 3B, 3E, 3K, 3P, 3R, 4A, 4B and 4C, it was 265 grams of crack presented to the jury. There's another 25 grams from Government's Exhibit 16, which was the controlled purchase from Mr. Barnett. Mr. Knox testified to another 378 grams of crack that he transacted with Mr. Barnett. Maurice Robinson testified that he, for about a year on a conservative estimate, purchased about 9 ounces per week from Mr. Barnett of crack. And then Mr. Camp and Mr. Meeks both also testified to numerous transactions involving crack with Mr. Barnett.

(Id., Doc. No. 970 at 6-7).

Petitioner's counsel argued that the prosecution's amount was too high because the evidence from Robinson reflects purchases of just over one kilo and that the other witnesses may have been double-counting Petitioner as a buyer and supplier. (Id., Doc. No. 970 at 7).

The Court found by the preponderance of the evidence that Petitioner was either involved in or reasonably foresaw his co-conspirators being involved in at least 840 grams of cocaine base. (Id., Doc. No. 970 at 8). The Court further found that the applicable base offense level for group 1 is 32, and that the enhancement for a criminal livelihood was inapplicable. The adjusted offense level for Group 1 was therefore 38. With regards to the multiple count adjustment, Group 2 was one unit and Group 3 was .4 units for a total of 2.5 units, resulting in a 3-level increase in offense level, resulting in a combined adjusted offense level of 41. The Court found that Petitioner qualified as a career offender and that the total offense level of 41. The Court found that Petitioner did commit conspiracy to commit murder in aid of racketeering in the Deray Jackson event as well as with an unindicted co-conspirator. The Court further found that Petitioner would still be a career offender without the conviction in paragraph 87, and that this conviction was within 15 years of

5

the commission of the instant offense. See (Id., Doc. No. 970 at 64-65). The Court entertained Petitioner's argument about his criminal history calculation and found that Petitioner was properly scored with 15 criminal history points. (Id., Doc. No. 970 at 29). The resulting total offense level was 41 and the criminal history category was VI, resulting in an advisory guideline range of 360 months to life imprisonment. See (Id., Doc. No. 947).

The Court sentenced Petitioner to 360 months' imprisonment for Counts (1) and (2), concurrent; 48 months for Count (3), concurrent; 240 months for Counts (4), (24), and (27), concurrent; and 120 months for Count (14), concurrent, followed by a total of five years of supervised release. (Id., Doc. No. 946). This is the same sentence the Court would have imposed under the § 3553(a) factors even if Petitioner's PSR objections had been granted. See (Id., Doc. No. 947 at 64-65).

On direct appeal, the Fourth Circuit Court of Appeals affirmed Petitioner's conviction and sentence on October 12, 2016. Barnett, 660 F. Appx. at 235. First, Petitioner challenged the sufficiency of the evidence to support his conviction under 18 U.S.C. § 1959 for conspiring to murder Deray Jackson in order to maintain or increase his position in UBN. The Fourth Circuit rejected this argument as follows:

> Barnett's conviction for conspiracy to commit murder in aid of racketeering rested primarily on a June 23, 2011, phone call among Barnett and several inmates at the Bertie Correctional Center in North Carolina. An inmate named Joseph Gray added Barnett to the call to discuss the "insubordination" of fellow G–Shine member Nathaniel Graham. J.A. 1639. Barnett and other participants on the call discussed the fact that Deray Jackson, an inmate who was not affiliated with UBN, had stolen a cell phone. In response, Gray and others had ordered Graham to "eat" Jackson and, in addition, made clear that "[t]his was his day to die." J.A. 1651, 1654. Graham did not immediately carry out this order, angering Gray and prompting the call.
>
> Graham's hesitation to follow orders brought to the forefront internal strife involving two subsets of G–Shine—Pretty Tony and Black Gangsta Bloods ("BGB")—that Robbs and Barnett were attempting to bring under the UBN

6

umbrella. Barnett and certain other G–Shine members viewed Pretty Tony and BGB as part of G–Shine. Other members of G–Shine, however, were less welcoming to the new subsets, neither of which was officially added to UBN by Wilkinson, G–Shine's godfather. During the phone call, the inmates discussed their annoyance that others in UBN did not "accept the fact that [Pretty] Tony is Shine now" and not "a[n] individual entity." J.A. 1637. Graham, who was affiliated with G–Shine and BGB, had failed to follow an order from high-ranking members of Pretty Tony and had expressed doubt over their authority.

On the call, Barnett—who was identified as a high-ranking member of BGB—scolded Graham for failing to follow orders, stating that "Pretty Tony is Shine" and "[y]ou ain't even supposed to hesitate to eat the plate from the beginning." J.A. 1637, 1643, 1652. When another participant on the call asked why Jackson had not yet been shot, Barnett responded "more east," J.A. 1653, which is a UBN term indicating understanding or agreement.

Four days after the call, Jaimel Davidson, a member of G–Shine, violently assaulted Jackson with a "slashing weapon." J.A. 924. Graham was present at the attack. Based on the evidence presented, the jury convicted Barnett of conspiring to murder Jackson, in violation of 18 U.S.C. § 1959.

Barnett, 660 F. App'x at 240–41.

The Fourth Circuit found that a rational juror could have found that the conspiracy to murder Jackson was related to UBN and that there was sufficient evidence that Petitioner's participation in the plan to murder Jackson helped Petitioner maintain or increase his position in UBN. The Fourth Circuit rejected Petitioner's argument that the Court erred by allowing Detective Stephen Parker and UBN members Maurice Robinson and Rafus Camp to testify regarding slang words sued in recorded phone calls. The Fourth Circuit found that, any error in admitting the challenged testimony did not substantially sway the jury's verdict.

With regards to RICO conspiracy, Petitioner argued that the Court erroneously instructed the jury regarding the "pattern of racketeering activity" required for a RICO conspiracy conviction, arguing that the instructions failed to adequately explain that predicate acts that show a pattern of criminal activity must be related to the racketeering enterprise. The Fourth Circuit found that the

jury instructions thoroughly discussed the elements of RICO conspiracy and fairly and accurately stated the controlling law.

Finally, Petitioner argued on direct appeal that the Court improperly sentenced him as a career offender because he did not have at least two prior felony convictions of either a crime of violence or controlled substance offense pursuant to Johnson v. United States, 135 S.Ct. 2551 (2015). The Fourth Circuit found that, even if the career offender designation was erroneous, any such error was harmless because the Court placed Petitioner in a criminal history category of VI, the same category that he would have received absent the career offender designation, and sentenced him to 360 months' imprisonment, which is the bottom end of the guideline range. Moreover, the Court made clear that it would have imposed the same 360-month sentence based solely on the sentencing factors without consideration of the sentencing guidelines.

In May 2017, Petitioner filed a *pro se* "Motion to Remand" in which he argued that the case was improperly removed to federal court and that the Court lacked subject-matter jurisdiction over the criminal case. (3:12-cr-188, Doc. No. 1070). The Court denied the Motion as frivolous in a text order on June 1, 2017. The Fourth Circuit affirmed, United States v. Barnett, 697 Fed. Appx. 153 (4th Cir. 2017), and the United States Supreme Court denied certiorari on January 8, 2018, Barnett v. United States, 138 S.Ct. 695 (2018), *reh'g den*, 2018 WL 1460837 (March 26, 2018).

Petitioner timely initiated the instant § 2255 proceedings. Petitioner argues:[2] (1) trial counsel was ineffective for: (A) failing to move to dismiss the RICO conspiracy count, to which the Court applied the wrong legal standard; (B) failing to successfully challenge evidence obtained from a wiretap of Petitioner's phone; (C) laboring under a conflict of interest; (D) failing to object

---

[2] Petitioner's lengthy claims have been renumbered and restated. Any claim or argument not specifically addressed in this Order has been considered an rejected.

to the criminal history calculation; (E) failing to timely present Petitioner with a plea offer; (F) failing to invoke the sequestration rule; (G) failing to object to co-conspirators' post-conspiracy statements; (H) failing to present voice analysis evidence at trial; (I) failing to re-cross examine Officer Parker about the attempted murder of Deray Jackson; (J) failing to object to the drug weight calculation; (K) failing to object to the career offender designation; and (2) appellate counsel was ineffective for failing to raise the foregoing claims of ineffective assistance of trial counsel and a preserved PSR error on direct appeal.

The Government filed a Response arguing that the career offender claim is barred by law of the case because the Fourth Circuit rejected it on direct appeal, and the remaining claims are meritless. (Doc. No. 11).

Petitioner filed a Reply arguing that his claims are meritorious, and that the Government failed to adequately address several of his claims. (Doc. No. 17).

## II.    STANDARD OF REVIEW

A federal prisoner claiming that his "sentence was imposed in violation of the Constitution or the laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence." 28 U.S.C. § 2255(a). Rule 4(b) of the Rules Governing Section 2255 Proceedings provides that courts are to promptly examine motions to vacate, along with "any attached exhibits and the record of prior proceedings . . ." in order to determine whether the petitioner is entitled to any relief on the claims set forth therein.  After examining the record in this matter, the Court finds that the argument presented by the Petitioner can be resolved based on the record and governing

case law and that no evidentiary hearing is warranted. See Raines v. United States, 423 F.2d 526, 529 (4th Cir. 1970).

## III.     DISCUSSION

### (1)     Ineffective Assistance of Trial Counsel Claims

The Sixth Amendment to the U.S. Constitution guarantees that in all criminal prosecutions, the accused has the right to the assistance of counsel for his defense.  See U.S. Const. Amend. VI. To show ineffective assistance of counsel, Petitioner must first establish deficient performance by counsel and, second, that the deficient performance prejudiced him. See Strickland v. Washington, 466 U.S. 668, 687-88 (1984). The deficiency prong turns on whether "counsel's representation fell below an objective standard of reasonableness ... under prevailing professional norms." Id. at 688. A reviewing court "must apply a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance." Harrington v. Richter, 562 U.S. 86, 104 (2011) (quoting Strickland, 466 U.S. at 689). The Strickland standard is difficult to satisfy in that the "Sixth Amendment guarantees reasonable competence, not perfect advocacy judged with the benefit of hindsight." See Yarborough v. Gentry, 540 U.S. 1, 8 (2003). The prejudice prong inquires into whether counsel's deficiency affected the judgment. See Strickland, 466 U.S. at 691. A petitioner must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694. In considering the prejudice prong of the analysis, a court cannot grant relief solely because the outcome would have been different absent counsel's deficient performance, but rather, it "can only grant relief under … Strickland if the 'result of the proceeding was fundamentally unfair or unreliable.'"   Sexton v. French, 163 F.3d 874, 882 (4th Cir. 1998) (quoting Lockhart v. Fretwell, 506 U.S. 364, 369 (1993)).

10

Under these circumstances, the petitioner "bears the burden of affirmatively proving prejudice." Bowie v. Branker, 512 F.3d 112, 120 (4th Cir. 2008). If the petitioner fails to meet this burden, a "reviewing court need not even consider the performance prong." United States v. Rhynes, 196 F.3d 207, 232 (4th Cir. 1999), *vacated in part on other grounds*, 218 F.3d 310 (4th Cir. 2000).

Petitioner raises a number of claims of ineffective assistance of trial counsel that will be addressed in turn.

**(A)    RICO Conspiracy**

To prove a RICO conspiracy under 18 U.S.C. § 1962(d), the government must prove the existence of an enterprise affecting interstate commerce in which the defendant conspired to participate, and that the defendant conspired that a member of the enterprise would perform at least two racketeering acts constituting a pattern of racketeering activity. United States v. Taylor, 942 F.3d 205, 213 (4th Cir. 2019) (quoting United States v. Pinson, 860 F.3d 152, 161 (4th Cir. 2017), citing Salinas v. United States, 522 U.S. 52, 62 (1997)). To establish a "pattern of racketeering activity," the government must prove, as the district court instructed the jury, that "the conspiracy involved or would have involved the commission of [at least] two racketeering acts." 18 U.S.C. § 1961(5). The RICO statute defines qualifying racketeering acts to include certain state law crimes, such as robbery, and acts indictable under specific federal statutes including the Hobbs Act, 18 U.S.C. § 1951. 18 U.S.C. § 1961(1)(B). A "de minimis" effect on interstate commerce is all that is required to satisfy the interstate commerce element. United States v. Cornell, 780 F.3d 616, 621 (4th Cir. 2015); United States v. Gray, 137 F.3d 765, 772-73 (4th Cir. 1998) (*en banc*).

Petitioner argues that counsel should have moved to dismiss the RICO conspiracy charge because the attempted robberies of a drug dealer are not acts affecting interstate commerce and were not reasonably foreseeable to Petitioner, and that conspiracy to commit Hobbs Act robbery

11

is not a predicate violent felony. He further argues that the Court relied on the wrong legal standard for determining whether there was an effect on interstate commerce.

Petitioner's claim about the interstate commerce element is refuted by the record insofar as counsel did raise the appropriate standard of proof with regards to the effect on interstate commerce. See (3:12-cv-188, Doc. No. 810 at 37). The Court denied the defense objection and adopted the correct standard under Fourth Circuit law. (Id., Doc. No. 810 at 38); see Cornell, 780 F.3d at 616. Petitioner's argument that this standard was somehow invalidated because the Court referred to unpublished case law is frivolous. This claim is also barred insofar as the Fourth Circuit found on direct appeal that the Court's jury instructions on RICO conspiracy and fairly and accurately stated the controlling law.

There was ample evidence upon which the jury could have found at least a *de minimis* effect on interstate commerce and an adequate relationship between the predicates and the racketeering activity. The evidence in the case included UBN's leadership in New York, Petitioner's communications and contacts with the New York leadership, and Petitioner's involvement with distributing narcotics from outside North Carolina, as demonstrated by recordings of Petitioner's phone conversations and former gang members' trial testimony. Petitioner's arguments that the predicate offenses were about personal gain rather than furthering UBN do not defeat the overwhelming evidence upon which the jury could have concluded that Petitioner engaged in two or more of the predicate acts as part of a pattern of racketeering activity. See, e.g., United States v. Jones, 795 F. App'x 889 (4th Cir. 2019) (affirming RICO conspiracy conviction on the testimony of several witnesses that defendant was a gang member, sold drugs in gang territory, that only gang members could sell drugs in the gang's territory, and that defendant committed several crimes on behalf of the gang, which was substantial evidence showing he

12

committed the acts and that the acts were on behalf of the gang). Petitioner's argument that attempted robberies could not have affected interstate commerce because they never actually occurred is frivolous. As stated above, the Government was required to prove that the enterprise affected interstate commerce, which it did. See Taylor, 942 F.3d at 213; see 18 U.S.C. § 1961(1)(a) (defining "racketeering activity" to include "any act or threat involving … robbery … which is chargeable under State law and punishable by imprisonment for more than one year."). Any suggestion that Hobbs Act robbery is not a RICO predicate likewise fails. The RICO statute defines "racketeering activity" to include any act "which is indictable under … 18 U.S.C. § 1951." 18 U.S.C. § 1961(1)(B). Section 1951 prohibits conspiracy to obstruct, delay, or affect commerce by robbery or extortion, so Hobbs Act conspiracy expressly qualifies as a RICO predicate. 18 U.S.C. § 1951(a). Petitioner has failed to identify any grounds that would warrant dismissing the RICO conspiracy charge, and therefore, counsel was not ineffective for failing to raise this meritless claim.

For the foregoing reasons, Petitioner's claims that counsel was ineffective with regards to the RICO conspiracy charge will be denied.

    **(B)**    <u>**Wiretap**</u>

In addition to demonstrating probable cause, the Government bears the burden of showing the "necessity" of any wiretap application via a full and complete statement as to whether "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C.A. § 2518(3). The burden that this provision imposes on the Government, however, "is not great, and the adequacy of such a showing is to be tested in a practical and commonsense fashion that does not hamper unduly the investigative powers of law enforcement agents." United States v. Smith, 31 F.3d 1294, 1297 (4th Cir. 1994)

(internal quotation marks and citation omitted). Although wiretaps are disfavored tools of law enforcement, the Government "need only present specific factual information sufficient to establish that it has encountered difficulties in penetrating the criminal enterprise or in gathering evidence [such that] wiretapping becomes reasonable." Id. at 1298 (internal quotation marks, alteration, and citation omitted).

Petitioner contends that counsel was ineffective for failing to allow Petitioner to view the "master affidavit" upon which the wiretap warrant was obtained, and for failing to file a timely Motion to Suppress the information gleaned from that wiretap. He contends that, had counsel timely filed the Motion to Suppress challenging the wiretap, the charges against Petitioner would have been dismissed. In his Reply, Petitioner contends that the wiretap affidavit did not comply with any of the requirements to obtain a wiretap. See (Doc. No. 17 at 6).

As a preliminary matter, Petitioner's claim is too vague and conclusory to support relief because he does not adequately describe counsel's alleged ineffectiveness. Petitioner states in a conclusory manner that Petitioner wanted to view the "master affidavit" to search for insufficiencies and that the Motion to Suppress would have been granted had counsel timely filed it. However, Petitioner does not identify any defects in the warrant or any meritorious grounds for suppression. As such, he has not demonstrated deficient performance by counsel or prejudice, so this claim fails on its face. See generally United States v. Dyess, 730 F.3d 354 (4th Cir. 2013) (vague and conclusory allegations contained in a § 2255 petition may be disposed of without further investigation by the district court).

Moreover, this claim is refuted by the record. Petitioner appears to challenge the wiretap of Petitioner's cell phones that the Court authorized on May 16, 2011 in case number 3:11-mc-88-RJC, of which the Court takes judicial notice. See (3:12-cr-188, Doc. No. 344) (Notice of Intent

14

to Rely on Wiretaps); Fed. R. Ev. 201. The warrant application is valid on its face. It indicates that the normal investigative procedures were unsuccessful and/or are too dangerous to employ, sets forth probable cause, and describes in detail the basis for the wiretap. See (3:11-mc-88, Doc. No. 1-1); see, e.g., United States v. Smith, 31 F.3d 1294 (4th Cir. 1994) (wiretap application was sufficient where it explained the various traditional investigative procedures that police had been using to investigate a drug distribution operation in the nine months leading up to the wiretap application, explaining in some detail why the police believed why normal investigative procedures would be unlikely to produce the information sought, and contained sufficient facts for the issuing court to reasonably conclude that using undercover agents or informants was too dangerous to be a reasonable option). Therefore, even if Petitioner had been able to examine the affidavit and had counsel filed a timely Motion to Suppress, there is no reasonable probability that the outcome would have been different.

Petitioner's claims about the wiretap and Motion to Suppress are too vague, conclusory and speculative to support relief and, in any event, are refuted by the record. This claim will accordingly be denied.

(C)   **Conflict of Interest**

To establish ineffective assistance of counsel based on a conflict of interest, a defendant who raised no objection at trial must demonstrate that (1) counsel operated under an "actual conflict of interest;" and (2) this conflict "adversely affected his lawyer's performance." United States v. Dehlinger, 740 F.3d 315, 322 (4th Cir. 2014) (quoting Cuyler v. Sullivan, 446 U.S. 335, 348 (1980)). If the petitioner satisfies this showing, "prejudice is presumed and [he] need not demonstrate a reasonable probability that, but for counsel's conflicted representation, the outcome of the proceeding would have been different." Woodfolk v. Maynard, 857 F.3d 531, 553 (4th Cir.

15

2017) (citing United States v. Nicholson, 611 F.3d 191, 195 (4ᵗʰ Cir. 2010)). An actual conflict exists when a petitioner shows that his counsel "actively represented conflicting interests." Sullivan, 446 U.S. at 350. "A defendant has established an adverse effect if he proves that his attorney took action on behalf of one client that was necessarily adverse to the defense of another or failed to take action on behalf of one because it would adversely affect another." Mickens v. Taylor, 240 F.3d 348, 360 (4ᵗʰ Cir. 2001) (*en banc*); see Dehlinger, 740 F.3d at 322.

Petitioner contends that counsel John Cacheris, who represented Petitioner in the underlying criminal case between March 31, 2014 and November 21, 2014, failed to tell the Court or Petitioner that he had previously represented a government witness, Maurice Robinson, a/k/a Hell-Rell, on the same case.

Petitioner's contention is too vague and conclusory to support relief in that he fails to specify the dates or proceedings during which Cacheris allegedly represented co-defendant Robinson. See Dyess, 730 F.3d at 354. Moreover, this claim is conclusively refuted by the Court's records, of which it takes judicial notice. See Fed. R. Ev. 201. Robinson was represented at his initial appearance on May 18, 2012, by Emily Marroquin at which time Robinson requested the appointment of counsel. Lucky Theophilus was appointed to represent Robinson that same day and that representation continued through the entry of Robinsons' judgment. See (3:12-cr-188, Doc. Nos. 38, 744). Osho remained counsel of record for Robinson until supervised release revocation proceedings were initiated, at which point Elizabeth Anne Blackwood entered an appearance for Robinson on October 13, 2017. Blackwood was terminated as counsel and W. Kelly Johnson entered an appearance for Robinson on January 24, 2020. Thus, any suggestion that an actual conflict existed is refuted by the record. Moreover, assuming *arguendo* that a conflict existed, Petitioner has failed to demonstrate any adverse effect on his representation whatsoever.

16

Petitioner's claim about a conflict of interest is too vague and conclusory to support relief, is refuted by the record, and will be denied.

**(D)   Criminal History Calculation**

The United States Sentencing Guidelines provide that an offender's criminal history category is determined by totaling the criminal history points. U.S.S.G. § 4A1.1 (2013). Three points are added for each prior sentence of imprisonment exceeding one year and one month. U.S.S.G. § 4A1.1(a). One point is added for each prior sentence resulting from a conviction of a crime of violence that did not receive any points under 4A1.1(a) because such sentence was counted as a single sentence, up to a total of three points for this subsection. U.S.S.G. § 4A1.1(e). Prior sentences are always counted separately if the sentences were imposed for offenses that were separated by an intervening arrest. If there is no intervening arrest, prior sentences are counted separately unless the sentences resulted from offenses contained in the same charging instrument or the sentences were imposed on the same day. U.S.S.G. § 4A1.2(a)(2).

Petitioner contends that counsel failed to object when the Court improperly separated several consolidated offenses and scored some dismissed offenses. Petitioner argues that he was improperly scored three points for conspiracy to commit robbery with a dangerous weapon (94CRS008005); two points for felony possession of cocaine that was dismissed (96CR023238/051597); four points for two consolidated common law robberies (97CRS018233, 97CRS018234); five points for consolidated first degree burglary (99CRS029607), larceny from the person (99CRS029608), robbery with a dangerous weapon (99CRS029609), carrying a concealed weapon (99CRS029610), possession of a firearm by a felon (99CRS029611), second degree kidnapping (99CRS029612), and habitual felon (99CRS037213); and three points for possession of a firearm by a felon (08CRS054513).

17

Petitioner's contention that counsel failed to object to the scoring of his prior convictions is conclusively refuted by the record. Counsel filed objections to the PSR's calculation of his criminal history and presented those objections at the sentencing hearing. (3:12-cr-188, Doc. No. 901 at 5); (Id., Doc. No. 970 at 29-30). Petitioner cannot demonstrate prejudice because he has not identified any meritorious scoring errors. The 1994 conspiracy offense was scored three points because it is a felony conviction. U.S.S.G. § 4A1.1(a); (3:12-cr-188, Doc. No. 909 at ¶ 87). Petitioner's contention that he was scored two points for a dismissed charge of felony possession of cocaine is mistaken; he was not scored any criminal history points for that offense. (Id., Doc. No. 909 at ¶ 106). Petitioner's consolidated convictions for common law robberies were correctly scored a total of four points; three points for a felony conviction under 4A1.1(a) and one point under 4A1.1(e) for an additional conviction that was not scored under 4A1.1(a) because there was a single sentence. (Id., Doc. No. 909 at ¶ 90). The consolidated convictions for first-degree burglary, larceny from a person, robbery with a dangerous weapon, carrying a concealed weapon, possession of a firearm by a felon, second-degree kidnapping, and habitual felon were scored five points; three points were scored for a felony conviction under 4A1.1(a) and two more points under 4A1.1(e) for additional convictions that were not scored under 4A1.1(a). (Id., Doc. No. 909 at ¶ 91). The felony conviction for possession of a firearm by a felon was scored three points under § 4A1.1(a) and Petitioner was not scored any criminal history points for dismissed charges. (Id., Doc. No. 909 at ¶ 92).

Petitioner has failed to identify any scoring error to which counsel should have objected, and none of these frivolous objections would have succeeded had counsel raised them. See generally Lockhart v. Fretwell, 506 U.S. 364, 374 (1993) (a defendant is not prejudiced if his counsel fails to make an objection that is "wholly meritless under current governing law").

18

Moreover, Petitioner cannot demonstrate prejudice because the Court found that, even if Petitioner's objections had been sustained, it would have imposed the same sentence under the § 3553(a) factors. (Id., Doc. No. 947 at 64-65).

For all the foregoing reasons, this claim will be denied.

**(E)      Plea Offer**

The Sixth Amendment right to the assistance of counsel during criminal proceedings extends to the plea-bargaining process. See Missouri v. Frye, 566 U.S. 134 (2012). Thus, criminal defendants are "entitled to the effective assistance of competent counsel" during that process. Lafler v. Cooper, 566 U.S. 156, 162 (2012) (internal quotation marks omitted); Merzbacher v. Shearin, 706 F.3d 356, 363 (4th Cir. 2013). As a general rule, defense counsel has the duty to communicate formal offers from the prosecution to accept a plea on terms and conditions that may be favorable to the accused. Frye, 566 U.S. at 145. To show prejudice from ineffective assistance of counsel where a plea offer has lapsed or been rejected because of counsel's deficient performance, a defendant must demonstrate a reasonable probability he would have accepted the earlier plea offer had he been afforded effective assistance of counsel, as well as a reasonable probability the plea would have been entered without the prosecution canceling it or the trial court refusing to accept it. Id. at 147. It is necessary to show a reasonable probability that the end result of the criminal process would have been more favorable by reason of a plea to a lesser charge or a sentence of less prison time. Id.

Petitioner contends that counsel failed to inform Petitioner about a plea offer prior to the first day of trial so that Petitioner could make an informed decision whether or not to proceed to trial or accept the offer. In his Reply, Petitioner further contends that counsel tried to coerce him

19

to accept the offer without giving him adequate time to consider the plea offer and that he would have accepted the offer and received a lower sentence but for counsel's ineffective assistance.

This claim is conclusively refuted by the record. Petitioner's counsel explained in open court that Petitioner had been offered a guilty plea to the RICO charge which was unacceptable to Petitioner because he would be facing, potentially, a life sentence, and that this offer had been presented to Petitioner in June or July. (3:12-cr-188, Doc. No. 805 at 5). Petitioner confirmed on the record that his memory of these events was refreshed during a recess, that understood the plea offer and was rejecting it that day, and that he would have rejected it previously. (3:12-cr-188, Doc. No. 805 at 6-7). Petitioner's present self-serving claims that counsel did not present him with a plea offer prior to the first day of trial and, that if counsel had done so he would have accepted, are conclusively refuted by his own statements in open court and will be denied. See generally Blackledge v. Allison, 431 U.S. 63, 74 (1977) ("Solemn declarations in open court carry a strong presumption of verity. The subsequent presentation of conclusory allegations unsupported by specifics is subject to summary dismissal, as are contentions that in the face of the record are wholly incredible."); United States v. Lemaster, 403 F.3d 216, 221–22 (4th Cir. 2005) (§ 2255 petitioner's sworn statements during the plea colloquy conclusively established that his plea agreement and waiver were knowing and voluntary). Even if counsel had somehow performed deficiently in communicating the plea offer to Petitioner, the record reflects that any such deficiency did not prejudice Petitioner because he was unwilling to plead guilty to RICO conspiracy under any circumstances due to his sentencing exposure.

Based on the foregoing, this claim is conclusively refuted by the record and will be denied.

**(F)**    **Witness Sequestration**

The Federal Rules of Evidence provide that, at a party's request, the court must order witnesses excluded so that they cannot hear other witnesses' testimony. Fed. R. Ev. 615. This rule has several exceptions, including "an officer or employee of a party that is not a natural person, after being designated as its representative by its attorney," and a person "whose presence a party shows to be essential to presenting the party's claim or defense. Fed. R. Ev. 615(b)-(c). In criminal cases, "these exceptions are applied to allow the prosecution's case agent to remain at counsel table with the prosecutor, hear the other witnesses testify, and nevertheless testify on behalf of the prosecution." United States v. Rhynes, 218 F.3d 310, 319 (4th Cir. 2000); United States v. Parodi, 703 F.2d 768, 773 (4th Cir. 1983); United States v. Farnham, 791 F.2d 331, 335 (4th Cir. 1986) (the government is generally permitted to have one case agent in the courtroom during trial).

Petitioner contends that counsel was ineffective for failing to move to sequester witnesses during the trial. As a result, he argues, Government witnesses were able to listen to each other's testimony and tailor their testimony. In his Reply, Petitioner explains that this claim relates to the case agent, who was able to sit at the prosecution table during trial. (Doc. No. 17 at 10-11).

Petitioner's general claim that counsel was ineffective for failing to invoke the sequestration rule and that witnesses were able to tailor their testimony is too vague and conclusory to support relief. See Dyess, 730 F.3d at 354. Petitioner's more specific claim that a case agent was allowed to remain at the prosecution's table during trial is meritless because a case agent would have been permitted to remain in the courtroom to assist the prosecution with the presentation of its case even if the rule had been invoked. See generally Fed. R. Ev. 615(b)-(c).

Petitioner has failed to establish either deficient performance or prejudice, and therefore, this claim will be denied.

**(G)** **Co-Conspirator Statements**

There is an exception to the hearsay rule for testimony that is offered against an opposing party and it "was made by the party's coconspirator during and in furtherance of the conspiracy." Fed. R. Ev. 801(d)(2)(E).

Petitioner contends that counsel was ineffective for failing to object when post-arrest statements of co-conspirators Maurice Robinson, Rafus Camp, William Knox was used at trial in violation of Fed. R. Ev. 801(d)(2)(E). Petitioner further claims that these statements were prejudicial.

This claim is too vague and conclusory to support relief because Petitioner fails to identify any particular inadmissible statements by Robinson, Camp, or Knox that were not objected to at trial, or explain how counsel's failure to object prejudiced him. See Dyess, 730 F.3d at 354. Further, assuming *arguendo* that counsel failed to object to any such statements, there is no reasonable probability that Petitioner was prejudiced by them in light of the overwhelming evidence of Petitioner's guilt, including his own recorded conversations.

Therefore, this claim will be denied.

**(H)** **Voice Analysis**

Counsel's "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." Wiggins v. Smith, 539 U.S. 510, 521 (2003). In other words, "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." Id. A particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, "applying a heavy measure of deference to counsel's judgments." Id. at 522 (citing Strickland, 466 U.S. at 690-691). Counsel's "strategic

22

choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." <u>Strickland</u>, 466 U.S. at 690. For instance, "the decision whether to call a defense witness is a strategic decision demanding the assessment and balancing of perceived benefits against perceived risks, and on to which we must afford enormous deference." <u>United States v. Terry</u>, 366 F.3d 312, 317-18 (4th Cir. 2004); <u>see</u> <u>Waters v. Thomas</u>, 46 F.3d 1506, 1512 (11th Cir. 1995) (which witnesses, if any, to call, and when to call them, "is the epitome of a strategic decision, and it is one that we will seldom, if ever, second guess."). To support an ineffective assistance claim based on the failure to investigate, a petitioner must present specific information to show what favorable evidence the investigation would have produced. <u>See</u> <u>Beaver v. Thompson</u>, 93 F.3d 1186, 1195 (4th Cir. 1996).

Petitioner contends that counsel was ineffective for failing to use a voice exemplar and present expert testimony to distinguish Petitioner's voice from the voice portrayed on the wiretap recordings. Officer Parker testified that the voice on the recordings was Petitioner's, but Parker is not qualified to present such evidence. Petitioner claims that, without a voice expert, there was no evidence showing that the voice was Petitioner's, and anyone can try to impersonate another person to falsely implicate them in a crime.

Petitioner's claim that there was no evidence identifying him as the speaker on the recordings other than Officer Parker's testimony is conclusively refuted by the record. Officer Parker, who obtained the wiretap, testified that:

> We knew it was Mr. Barnett's phone based on the prior work to get up on the – to ask the court to tap his phone based on undercover surveillance. We had seen him. The informants that had given us his number. And while we were on the phone tapping the phone, Mr. Barnett was seen by law enforcement surveillance during the course of conversations that we were intercepting over the wire. During the course of his wire intercepts, he was stopped numerous times by law enforcement with that phone in his possession that was registered to the number that we were intercepting.

(3:12-cr-188, Doc. No. 805 at 400.

In addition, other witnesses who participated in the recorded calls and who were familiar with Petitioner's voice testified that Petitioner was the one speaking. (Id., Doc. No. 806 at 5-6, 37) (Maurice Robinson); (Id., 807 at 16-17) (William Knox); (Id., Doc. No. 807 at 39) (William Meeks). Witnesses also testified that Petitioner has a very distinctive voice. (Id., Doc. No. 805 at 41) (Officer Parker); (Id., Doc. No. 806 at 125) (Officer Brogdon). Reasonable counsel could have concluded that a voice exemplar and/or expert voice analysis would have been counterproductive under these circumstances. See generally Burger v. Kemp, 483 U.S. 776 (1987) (concluding that failure to introduce character evidence was effective performance because witnesses could have been subjected to harmful cross-examination or invited other damaging evidence); Dehlinger, 740 F.3d at 315 (no adverse effect results from a trial lawyer's decision not to call witnesses whose testimony would be cumulative or potentially damaging to a defendant's case). Further, Petitioner has failed to come forward with any exculpatory evidence that had a reasonable probability of resulting in a different trial outcome and thus his claim is too vague and conclusory to support relief; he has not come forward with any evidence whatsoever that a voice exemplar or analysis would have aided his defense. See Beaver, 93 F.3d at 1195.

Therefore, Petitioner's claim that counsel was ineffective with regards to voice analysis evidence will be denied.

**(I)      Re-Cross Examination**

The governing rule is that "[w]here new evidence is opened up on redirect examination, the opposing party must be given the right of cross-examination on the new matter, but the privilege of recross-examination as to matters not covered on direct examination lies within the trial court's discretion." United States v. Blankenship, 846 F.3d 663, 669 (4th Cir. 2017) (quoting

24

United States v. Riggi, 951 F.2d 1368, 1375 (3d Cir. 1991) (quotation omitted)). "[I]f a new subject is raised in redirect examination, the district court must allow the new matter to be subject to re-cross examination." United States v. Fleschner, 98 F.3d 155, 158 (4th Cir. 1996). Redirect testimony raises a "new matter" when it "encompasses a subject outside of the scope of direct examination or when a witness offers materially different testimony regarding a subject first introduced on direct." Blankenship, 846 F.3d at 669. The recall of a witness for additional cross-examination is a matter within the discretion of the trial court. United States v. Gibson, 187 F.3d 631 (4th Cir. 1999), *judgment vacated on other grounds*, 531 U.S. 801 (2000).

Petitioner contends that counsel should have re-cross examined Officer Parker about the attempted murder of Deray Jackson due to an inconsistency in the evidence. Petitioner argues that Officer Parker's testimony that Petitioner attempted to have Deray Jackson murdered is contrary to the testimony of prison Captain Demetrius Clark that nobody attempted to have Jackson murdered and that Jackson owed someone money. Petitioner claims that this re-cross examination would have shown that Officer Parker is a liar.

Officer Parker testified on direct examination that a monitored conversation that included Petitioner and four inmates at Bertie Correctional Institution (Mustafa (Kentrell McIntyre), Joseph Gray (Killa), Nathaniel Graham (Nasty), Jim Jones (Buddhist)) indicated that an inmate named Deray may be targeted for murder due to insubordination within the gang. (Id., Doc. No. 805 at 119). A short time after that phone call, inmate Deray Jackson was stabbed on the face and neck by UBN member Jamiel Davidson, and Nathaniel Graham was also present. (Id., Doc. No. 805 at 122-25). Officer Parker was cross-examined on the extent of Petitioner's involvement in the recorded phone call. On redirect, Parker testified about Petitioner's involvement in the phone call

and explained that the phrase "eat the plate" meant that Graham was not supposed to ask questions and was just supposed to follow the order to kill Jackson. (Id., Doc. No. 750 at 61).

Captain Demetrius Clark, who worked at Bertie C.I. at the relevant time, testified that Jackson was assaulted with a slashing weapon across the face and neck by Blood Nations member Davidson, and that the injuries required a trip to the emergency room. (Id., Doc. No. 752 at 27, 29-30). When Clark interviewed Davidson after the attack, Davidson did not want to admit anything at first but then stated that he was owed money for some cigarettes and marijuana that Jackson was supposed to supply him with but failed to do so. (Id., Doc. No. 752 at 30-31). Clark testified on cross-examination that Davidson never said the assault was related to UBN and that the reason Davidson gave was for money. (Id., Doc. No. 752 at 35-36). Clark further testified on cross-examination that, although Davidson and Jackson slept in separate locations, they could have interacted in places such as the gym and at religious services, where "people can do drug deals." (Id., Doc. No. 752 at 37).

There was no basis for counsel to seek to recall Officer Parker for re-cross examination about his testimony that the assault on Jackson was gang-motivated or whether the assault was an attempted murder. While re-cross examination is appropriate to explore a new matter within the witness' own testimony, Captain Clark's testimony provided no basis to re-cross Officer Parker. See Blankenship, 846 F.3d at 669. Moreover, Petitioner has failed to demonstrate prejudice. While cross-examining Captain Clark, counsel highlighted the differences between Officer Parker's testimony that the assault was gang-related and Captain Clark's testimony that Davidson's stated reason for the assault was a dispute over money. With regards to whether the assault was an attempted murder, Captain Clark was thoroughly cross-examined regarding the extent of Jackson's injuries and whether they were life-threatening. Officer Parker was not present at the prison when

the assault occurred, did not interview Davidson, and did not witness Jackson's injuries, so any testimony from him on these points would have been outside the scope of his personal knowledge and irrelevant. Moreover, any discrepancies between Parker's testimony, which was gleaned from a wiretap phone call, and Clark's testimony, which was gleaned from incidents he witnessed in the prison, would not have demonstrated that Parker was a liar. Nor would attempting to impeach Parker with Captain Clark's testimony negate the recorded phone conversations that included Petitioner and were presented at trial. Petitioner fails to explain what more or different testimony counsel could have elicited from any of the witnesses that had a reasonable probability of resulting in a different outcome.

Therefore, this claim will be denied.

### (J)  Drug Amount

Acts in furtherance of a conspiracy are "attributable to the others for the purpose of holding them responsible for the substantive offense." Pinkerton v. United States, 328 U.S. 640, 647 (1946). In the context of conspiracies under § 841, "the jury must determine that the threshold drug amount was reasonably foreseeable to the individual defendant. United States v. Foster, 507 F.3d 233, 251 (4th Cir. 2007). The government bears the burden of proving by a preponderance of the evidence the quantity of drugs for which a defendant should be held accountable at sentencing. United States v. Gilliam, 987 F.2d 1009, 1013 (4th Cir. 1993).

Petitioner contends that counsel failed to object to the Court's finding that Petitioner is accountable for over 800 grams of narcotics based on the conduct of others and on which the mandatory minimum sentence was based under 21 U.S.C. § 841(b). Petitioner claims that he was only responsible for 23 grams of narcotics. Petitioner argues that, had counsel insisted upon an

adequate determination about what was reasonably foreseeable to Petitioner at sentencing, Petitioner would have received a substantially lower sentence.

Petitioner's contention that counsel failed to object to the drug quantity is conclusively refuted by the record. Counsel filed objections to the PSR objecting to the 2.1-kilogram crack cocaine amount and raised the issue at the sentencing hearing. (3:12-cr-188, Doc. No. 901 at 3); (Id., Doc. No. 970 at 7). The Government presented copious evidence to support the drug amount and the Court found, by the preponderance of the evidence, that Petitioner was either involved in or reasonably foresaw his co-conspirators being involved in at least 840 grams of cocaine base. (Id., Doc. No. 970 at 8). Petitioner has failed to explain what more counsel could have done to attack the well-supported drug amount. Moreover, Petitioner cannot demonstrate prejudice because the Court found that, even if Petitioner's objections had been sustained, it would have imposed the same sentence under the § 3553(a) factors. (Id., Doc. No. 947 at 64-65).

Petitioner has failed to demonstrate either deficient performance or prejudice, and therefore, this claim will be denied.

**(K)   Career Offender Designation**

It is well settled that a criminal defendant cannot "circumvent a proper ruling ... on direct appeal by re-raising the same challenge in a § 2255 motion." Dyess, 730 F.3d at 360 (quoting United States v. Linder, 552 F.3d 391, 396 (4th Cir. 2009)); see also United States v. Roane, 378 F.3d 382, 396 n. 7 (4th Cir. 2004) (noting that, absent "any change in the law," defendants "cannot relitigate" previously decided issues in a § 2255 motion); Boeckenhaupt v. United States, 537 F.2d 1182, 1183 (4th Cir.1976) (holding criminal defendant cannot "recast, under the guise of collateral attack, questions fully considered by this court [on direct appeal]"). Under the law of the case doctrine, once the decision of an appellate court establishes law of the case, it must be followed in

all subsequent proceedings in the same case in the trial court or on a later appeal unless: "(1) a subsequent trial produces substantially different evidence, (2) controlling authority has since made a contrary decision of law applicable to the issue, or (3) the prior decision was clearly erroneous and would work a manifest injustice." United States v. Aramony, 166 F.3d 655, 661 (4th Cir. 1999) (quoting Sejman v. Warner-Lambert Co., 845 F.2d 66, 69 (4th Cir. 1988)); see United States v. Francis, 62 Fed. Appx. 507 (4th Cir. 2003) (applying law of the case doctrine to bar the relitigation on § 2255 review of issues previously litigated on direct appeal).

Petitioner contends that counsel was ineffective for failing to object to the career offender designation that was based on two insufficient predicate offenses, burglary and common law robbery.

Petitioner challenged his qualification for the career offender designation on direct appeal and the Fourth Circuit rejected his argument. Petitioner has pointed to no circumstances that would warrant reconsideration of that issue. Therefore, this claim is barred, and it will be denied. Alternatively, this claim would be denied on the merits because no PSR error occurred and the Court would have imposed the same sentence even if Petitioner was not designated as a career offender. (Id., Doc. No. 947 at 64-65).

Therefore, this claim is barred and alternatively would be denied on the merits.

**(2)**    **Ineffective Assistance of Appellate Counsel Claim**

The Sixth Amendment entitles a criminal defendant to effective assistance of counsel on direct appeal. See Douglas v. California, 372 U.S. 353 (1963); see also Evitts v. Lucey, 469 U.S. 387 (1985); Strickland, 466 U.S. at 668. To show prejudice, a petitioner must show a "reasonable probability ... he would have prevailed on his appeal" but for his counsel's unreasonable failure to raise an issue. Smith v. Robbins, 528 U.S. 259, 285–86 (2000); see also United States v. Mannino,

212 F.3d 835, 845–46 (3d Cir. 2000) ("The test for prejudice under <u>Strickland</u> is not whether petitioners would likely prevail upon remand, but whether we would have likely reversed and ordered a remand had the issue been raised on direct appeal.").

Petitioner contends that appellate counsel was ineffective for failing to raise on direct appeal the foregoing claims of ineffective assistance of trial counsel, and the PSR grouping claim that counsel preserved at the sentencing hearing. He argues that raising these claims would have resulted in vacatur of the convictions and remand to correct the sentencing error.

Appellate counsel cannot be deemed ineffective for failing to raise the claims of ineffective assistance of trial counsel because such claims are only cognizable on direct appeal if the error is apparent on the face of the record, which it is not in this case. See <u>United States v. Benton</u>, 523 F.3d 424, 435 (4th Cir. 2008); <u>United States v. Baptiste</u>, 596 F.3d 214, 216 n. 1 (4th Cir. 2010). Therefore, the ineffective assistance claims were not cognizable on direct appeal and counsel was not ineffective for failing to present them to the Fourth Circuit. <u>Id.</u> Moreover, because the underlying arguments that trial counsel was ineffective are meritless, "it could scarcely be ineffective of appellate counsel not to raise them." <u>Coley v. Bagley</u>, 706 F.3d 741, 752 (6th Cir. 2013) ("[o]mitting meritless arguments is neither professionally unreasonable nor prejudicial."); see <u>Schneider v. United States</u>, 864 F.3d 518 (7th Cir. 2017) (appellate counsel was not ineffective for failing to raise trial counsel's alleged ineffective assistance on direct appeal because the complaints about trial counsel were meritless).

Nor can appellate counsel be deemed ineffective for failing to raise the regrouping claim on direct appeal because there is no reasonable probability that such a claim would have been successful. The Court's findings with regards to regrouping are supported by the record and Petitioner has failed to identify any meritorious claim in that regard. See (3:12-cr-188, Doc. No.

970 at 23-24). Further, Petitioner cannot establish prejudice because the Court alternatively based its sentencing determination on the § 3553(a) factors without regards to Petitioner's PSR objections. Appellate counsel cannot be deemed ineffective for failing to raise the regrouping claim on appeal under these circumstances. <u>See</u>, <u>e.g.</u>, <u>United States v. Mason</u>, 774 F.3d 824, 829 (4th Cir. 2014) (counsel was not ineffective for failing to present a "long shot" equal protection argument on appeal and instead presented a stronger Fourth Amendment claim).

Therefore, Petitioner's ineffective assistance of appellate counsel claims will be denied.

### IV.     CONCLUSION

For the foregoing reasons, Petitioner's Amended § 2255 Motion to Vacate is denied.

**IT IS, THEREFORE, ORDERED** that:

1.      Petitioner's Amended Motion to Vacate, Set Aside or Correct Sentence under 28 U.S.C. § 2255, (Doc. No. 7), is **DENIED**.

2.      **IT IS FURTHER ORDERED** that pursuant to Rule 11(a) of the Rules Governing Section 2254 and Section 2255 Cases, this Court declines to issue a certificate of appealability. <u>See</u> 28 U.S.C. § 2253(c)(2); <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 338 (2003) (in order to satisfy § 2253(c), a petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong); <u>Slack v. McDaniel</u>, 529 U.S. 473, 484 (2000) (when relief is denied on procedural grounds, a petitioner must establish both that the dispositive procedural ruling is debatable and that the petition states a debatable claim of the denial of a constitutional right).

3.      The Clerk is instructed to close this case.

Signed: June 12, 2020

Frank D. Whitney
United States District Judge