# UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTICT OF NORTH CAROLINA
# CHARLOTTE DIVISION

FILED
CHARLOTTE, NC

NOV 1 2 2020

US DISTRICT COURT
WESTERN DISTRICT OF NC


| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | **EMERGENCY COVID-19 FILING** |
| | § | |
| v. | § | NO. CR-266899 |
| | § | |
| ALAN BOYD DON BARNETT | § | |

## EMERGENCY MOTION FOR A REDUCTION IN
## SENTENCE PURSUANT TO 18 U.S.C. § 3582(c)(1)(A)(i)

Defendant, Alan Boyd Don Barnett, files this <u>pro se</u> emergency motion to resentence him to a sentence of imprisonment to be served on home-confinement, followed by a term of supervised release not to exceed the balance of his original prison sentence, pursuant to 18 U.S.C. § 3582(c)(1)(A)(i), as amended by § 603(b)(1) of the First Step Act of 2018, Pub. L. 115-391, 132 Stat. 5194, 5239 (Dec. 21, 2018).

1

# I.

Defendant has had no disciplinary incidents in BOP. To the contrary, he has worked hard, taken classes, and kept his head down. In candor, his confinement has been utterly uneventful until now.

# II.

COVID-19 unleashed itself on the BOP inmate population and staff at all BOP facilities in March of 2020 in a terrifying manner not ever seen at any BOP facility nationwide.

According to a *Washington Post* article about the impact of COVID-19 on BOP facilities, published on March 29, 2020, several inmates had died from the virus, with several guards admitted to a hospital intensive care unit, with many inmates and staff tested positive for the virus, and at least 100 or more inmates and an unknown number of staff were in quarantine. "It's been simultaneous, just people getting sick back to back to back to back," stated Corey Trammel, a union representative for BOP guards. "We don't know how to protect

ourselves. Staff are working 36-hour shifts—there's no way we can keep going on like this." Trammel believes that all prison staff have been exposed to the virus and should be in self-quarantine. Neither BOP nor its wardens provided comment to the *Post*.

A local media outlet, *The Lens*, reported on March 31, 2020, that BOP has stopped testing inmates who are symptomatic for COVID-19 because of "sustained transmission" at the facilities. In other words, to conserve valuable testing resources, BOP officials assume that anyone who presents with symptoms is positive. The virus is that rampant. Yet, BOP reportedly refuses to release the number of presumed positive cases, making it impossible to know exactly how many inmates at its prisons have contracted the virus. Evidently, it also declined to answer specific questions about what is taking place at its prisons, such as when the decision was made to stop testing, whether or not guards have been moving back and forth between the multiple prison facilities, how many inmates have been transferred to the hospital, or how the prison is defining "symptomatic."

3

BOP's living conditions  are composed of dormitories and units with two to six-man cells. The dormitories have  bunk beds in each unit, no more than two or three feet apart, with over 100 inmates crowded into each unit, with  no cells or other means of isolating or social distancing.  The BOP prison facilities with two-man cells, some cells holding four to eight inmates, with no means of isolating or social distancing.  Staff and guards travel back and forth between BOP facilities. In other words, if the virus hits any BOP facilities, it likely will infect the entire inmate population, including Defendant.

Several inmates at  each BOP facilities have contracted COVID-19.

Defendant  files this emergency _pro se_ motion for relief from his sentence because time is of the essence.  As Defendant drafts this _pro se_ motion, local media has reported that **_several_** inmates died from the virus since April 1, 2020.  All BOP prisons are on the cusp of becoming a _de facto_ Death Row and death traps.

4

## III.

Attorney General William Barr issued a memorandum on March 26, 2020, authorizing BOP to transfer at-risk, non-violent inmates who pose minimal likelihood of recidivism from BOP facilities to home confinement to protect the safety of BOP personnel and the inmate population in the face of COVID-19. Barr recognized that some inmates may be safer at home than in BOP facilities. Defendant is such an inmate.

It appears that BOP officials cannot implement the enumerated factors in the Barr Memo quickly enough to provide meaningful relief to inmates at its facilities.

Given the extraordinary circumstances of the spread of COVID-19 at BOP prisons—Defendant cannot wait any longer to seek compassionate release under 18 U.S.C. § 3582(c)(1)(A)(i).

5

IV.

For many years, 18 U.S.C. § 3582(c)(1)(A) has allowed district courts to reduce sentences of federal inmates for "extraordinary and compelling reasons," often referred to as "compassionate release." Until December 21, 2018, only the Director of BOP could request such a sentence reduction.

Under the First Step Act, BOP no longer has a monopoly on the decision whether to file "compassionate release" motions. Rather, federal inmates may file them with the original sentencing court. 18 U.S.C. § 3582(c)(1)(A), as amended by § 603(b)(1) of the First Step Act of 2018, Pub. L. 115-391, 132 Stat. 5194, 5239 (Dec. 21, 2018).

The Sentencing Commission policy statement on reductions of sentences under 18 U.S.C. § 3582(c)(1)(A) lists three specific categories of "extraordinary and compelling reasons" but expressly does not restrict what combination of factors can warrant release. U.S.S.G. § 1B1.13 (p.s.), comment. (n.1(A)-(D)).

6

## V.

"Extraordinary and compelling reasons" warrant a reduction of Defendant's sentence and immediate release from confinement. The rampant spread of COVID19 at all BOP facilities—resulting in the deaths of several inmates, the hospitalizations of prison staff, the isolation and quarantining of dozens of inmates who are positive for the virus or have been exposed to it, and the self-quarantining of countless staff—make it unsafe for any inmate to remain confined in any BOP prison.

A sentence reduction is consistent with and supported by the factors in 18 U.S.C. § 3553(a), whose consideration is mandated by § 3582(c)(1)(A) "to the extent they are applicable." Two of those factors now carry more weight than at the time of sentencing: (1) "the history and characteristics of the defendant," 18 U.S.C. § 3553(a)(1); and (2) "the need for the sentence imposed . . . to provide the defendant with . . . medical care . . . in the most effective manner," 18 U.S.C. § 3553(a)(2)(D). First, Defendant's vulnerability to COVID-19 weigh in

favor of reducing his sentence and/or placing him on home-confinement. Second, he is a non-violent offender and poses a low or no risk of recidivism. Third, his impeccable conduct in prison weighs heavily in his favor. Fourth, he has a re-entry plan that will prevent recidivism and ensure his health and safety as well as the public's health and safety should the Court reduce his sentence and/or places him on home-confinement. He will self-quarantine at home as long as necessary to ensure his health and safety and that of others. And he will obtain suitable, gainful employment. In sum, the § 3553(a) factors weigh heavily in Defendant's favor. This Court is in the business of weighing equities to make consequential decisions. Yet, other than habeas corpus proceedings in death penalty cases, few prior cases could have presented the potential, if not likely, life-or-death consequences that this case presents. The Court should grant this motion because so rarely do justice and mercy require the same result. *See Walker v. Martel,* 709 F.3d 925, 950-51 (9th Cir. 2013) (Gould, J., concurring in part & dissenting in part) ("Shakespeare told us that '[t]he

8

quality of mercy is not strain'd,' Milton instructed us to "temper so [j]ustice with mercy" and advised us that '[m]ercy [must] colleague with justice,' and President Lincoln reminded us that 'mercy bears richer fruits than strict justice.'") (citations omitted); *The Torah,* Micah 6:8 ("what does the Lord require of you but to do justice, and to love kindness, and to walk humbly with your God.").

Defendant's **pro se** motion seeks extraordinary relief for extraordinary circumstances. To mitigate the potential catastrophic harm that the COVID-19 pandemic will inflict upon Defendant and other incarcerated citizens, corrections staff, and all of our communities. Defendant ask the Court to exercise its plenary authority to immediately reduce the number of Federal Bureau of Prison (BOP) inmates, by granting Defendant's motion.

I

Pursuant to 18, U.S.C. Section 3621 (a), a person who has been sentenced to a term of imprisonment … shall be committed to the custody of the Bureau of Prisons until the expiration of the term imposed. Pursuant

9

to Section 3621 (b), the BOP shall designate the place of the prisoner's imprisonment. This can be any community center, or prison, or home-confinement. Title 18, U.S.C. Section 4042(a)(2) mandates BOP'S obligations in the safe keeping and care for its prisoners.

Defendant in this case is challenging the BOP's violations of Section 4042(a)(2) and violations of the Fifth and Eighth Amendments. He further challenges his conditions of his confinement as being a death trap. He is also challenging the "fact . . . of confinement in prison," as being a death trap infested with COVID 19. He further contend that the COVID-19 outbreak at his prison combine to place him in grave danger from COVID-19; that at current BOP facilities' population COVID-19 levels, BOP cannot comply with the mandates of 18, U.S.C. Section 4042(a)(2), and cannot comply with CDC guidelines for physical distancing; and that "[a]s long as prisoners are unable to practice physical distancing, any other mitigating steps will fail to decrease meaningfully the risk of COVID-19 infections at Defendant's prison." Defendant's motion seeks an order either releasing him from custody altogether or releasing him to **home-confinement**,

10

because, "[a]bsent significant de-densifying, people who are confined in BOP prisons, as well as staff, will find it impossible to engage in the necessary social distancing and hygiene required to mitigate the risk of transmission." "The only effective way to minimize the potential devastation from COVID-19 in BOP facilities generally and at Defendant's prison in particular is to downsize immediately the incarcerated population….". In short, Defendant contends that the fact of his confinement in prison itself amounts to direct violations of 18, U.S.C. Section 4042(a)(2) and violations of the **Fifth** and **Eighth Amendments** under these circumstances; and nothing short of an order ending his confinement at his prison will alleviate those violations.

## II

It is undisputed that there is an active and serious outbreak of COVID-19 at Defendant's prison, as well as at all BOP prisons.

The structure of BOP's prisons—even assuming that all reasonable precautions and safety measures are being fastidiously observed (which

the Petitioner dispute)—heightens the risk of transmission. The cornerstone of the public health response to COVID-19 is to practice "social distancing." "Limiting face-to-face contact with others is the best way to reduce the spread of [COVID-19]," including staying at least 6 feet from other people and avoiding group gatherings.

III

Defendant does not seek release from BOP custody; he seeks release/transfer from BOP's prisons where the COVID-19 has and is infesting inmates and staff, to **home-confinement**, or a community center, or other place free of the COVID-19.

IV

Defendant argue that BOP's inability, even if it tried, to adequately protect him and its other prisoners from the risks posed by the coronavirus subjects Defendant to substantial risk of suffering and harm, even death, in violation of **18 USC Section 4042 (a)(2),** and the **Fifth** and **Eighth Amendments**.

12

## V

**Defendant challenges BOP's dangerous housing-living conditions within BOP's prisons created by the COVID-19 virus, as violating the laws and Constitution of the United States.**

## VI

Defendant asserts that the only truly effective remedy to stop the spread of CIVID-19 in BOP prisons is to separate individuals—a measure that in our nation's densely populated prisons is typically impossible without the release of a portion of the population. Notably, Defendant does not seek a commutation of his sentence, or release from BOP custody, but rather to serve his sentence in an environment free from COVID-19, and the risk of the virus, such as home-confinement.

## VII

When Defendant was sentenced, nobody could have predicted that his term of imprisonment could be rendered a death sentence by an unprecedented COVID-19 pandemic. But the unthinkable happened,

13

and Federal statutes and the Constitution of the United States make it possible for the Court to adjust its sentences accordingly. See also 18 U.S.C. § 3582(c)(1)(A)(i), as amended by § 603(b)(1) of the First Step Act of 2018, Pub. L. 115-391, 132 Stat. 5194, 5239 (Dec. 21, 2018).

## DEFENDANT IS IN GRAVE DANGER OF DEATH

I

The fact of Defendant's confinement, specifically, his medical history (which his medical records are in the hands of the BOP), and the wide spread of COVID-19 outbreak in BOP prisons combine to place Defendant in grave danger, even death, from COVID-19; and at current BOP facility population COVID-19 levels, BOP cannot comply with the mandates of 18 U.S.C. Section **4042(a)(2),** and the **Fifth** and **Eighth Amendments**, or with CDC guidelines for physical distancing; and that "[a]s long as Defendant is unable to practice physical distancing, any other mitigating steps will fail to decrease meaningfully the risk of COVID-19 infections to Defendant." Because, "[a]bsent significant de-

densifying, Defendant confined in BOP prisons, as well as staff, will find it impossible to engage in the necessary social distancing and hygiene required to mitigate the risk of transmission." "The only effective way to minimize the potential devastation from COVID-19 in BOP facilities generally, and at his prison in particular, is to downsize immediately the incarcerated population....". In short, under these circumstances, the "fact" of Defendant's confinement in prison itself amounts to violations of Section **4042(a)(2)** and the **Fifth** and **Eighth Amendments**, and nothing short of an order ending his confinement at his prison will alleviate those violations.

II

Federal statutes and the **Fifth** and **Eighth Amendments** forbid cruel and unusual punishment; and do not allow a sentence to be served in conditions considered cruel and unusual punishment, or that would cause Defendnt's death. Title 18, U.S.C. Section **4042(a)(2),** and the **Fifth** and **Eighth Amendments** forbids the Bureau of Prisons (BOP) to place

Defendant in living conditions which could, or would, cause his certain death. See 18, U.S.C. Section **4042(a)(2),** and the **Fifth** and **Eight Amendments**.

III

All current and future persons incarcerated by the BOP of any age who experience: chronic lung disease or moderate to severe asthma; serious heart conditions; conditions that can cause a person to be immunocompromised, including cancer treatment, smoking, bone marrow or organ transplantation, immune deficiencies, poorly controlled HIV or AIDS or prolonged use of corticosteroids and other immune weakening medications; severe obesity (defined as a body mass index of 40 or higher); diabetes; chronic kidney disease or undergoing dialysis; or liver disease, are subject to death by the COVID-19 virous.

IV

BOP's own inmate  medical records show that BOP is unable to properly protect or care for its inmates, including Defendant  from the COVID-19. Thus, certainly it cannot protect Defendant from the

16

coronavirus virus, or to care for Defendant in the event the BOP imprisonment caused him to get the contagious coronavirus virus.

## V

The living quarters BOP provides Defendant are at the top of the list for certain death for him. BOP's own records on coronavirus virus, show that all BOP prisons are real and factual **death traps** for prisoners, and will **kill large numbers of inmates**.

BOP's living conditions do not afford Defendant and other individuals the opportunity to protect themselves. BOP prisons create the ideal environment for the transmission of contagious diseases. The truth is, the BOP has full knowledge, and facts, that prove that it cannot protect, or save prisoners from death from the deadly coronavirus virus. Thus, many inmates have been killed, and more will be killed simply because of BOP's failure to act to protect them.

## VI

The COVID-19 virus has already infected a large number of prison

17

guards as well as hundreds of inmates. It is a true fact that prison guards carry the virus into the prisons, and spread it among the prisoners.

The BOP's own fact show that inmates will be much safer at home on **home confinement**.

## Prisons Are Especially Susceptible to COVID-19 Contagion.

I

The COVID-19 virus is highly infectious and can be spread "easily and sustainably" from person-to-person. The virus can live on plastic and steel surfaces for up to 72 hours, and, powered by a single cough or sneeze, can be propelled in a gas cloud that extends up to 27 feet in length. To date, the virus is known to spread from person to person through respiratory droplets, close personal contact, and from contact with contaminated surfaces and objects, where the virus can survive for up to three days. Critically, people who are asymptomatic or presymptomatic can unknowingly transmit the virus, making it particularly difficult to slow its spread. There is no vaccine against COVID-19 and there is no known medication to prevent or treat infection

18

from COVID-19. Social distancing, or remaining physically separated from known or potentially infected individuals, and vigilant hygiene, including washing hands with soap and water, are the only known effective measures for protecting vulnerable people from COVID-19. It is now common knowledge—that COVID-19 is a highly dangerous disease that poses a significant risk of severe illness and death, particularly for members of the Medically Vulnerable Subclass. "Serious illness and death are most common among people with underlying chronic health conditions, like heart disease, lung disease, liver disease, and diabetes, and older age." *see* <u>Wilson v. Williams</u>, 2020 WL 1940882, at *8 (N.D. Ohio Apr. 22, 2020) ("For infected inmates, the virus can lead to pneumonia. In the wors[t] pneumonia cases, COVID-19 victims suffer diminishing oxygen absorption, with resulting organ failure leading to death."). According to one report, the mortality rate from COVID-19 is 8.4% for individuals with hypertension, 8.0% for individuals with chronic respiratory disease, 7.6% for individuals with cancer, and 13.2% for individuals with cardiovascular disease. ECF No. 1 at 9-11 (citing Report

19

of WHO-China Joint Mission on Coronavirus Disease 2019 (COVID-19), World Health Organization at 12 (Feb. 28, 2020). As a result, the only assured way to curb the pandemic is through dramatically reducing contact for all. Consequently, every American institution—from schools to places of worship, from businesses to legislatures—has been exhorted or ordered to reduce the number of people in close quarters, if not to empty entirely. People also have been told to undertake aggressive sanitation measures, such as cleaning and disinfecting all surfaces, using products with particular alcohol contents, and closing off any areas used by a sick person.

II

**The BOP does not use properly trained individuals for sterilization** of its cells, and inmate living quarters, and other places it houses its inmates. BOP use inmates who have had no proper training for such dangerous sterilization.

## III

People in congregate environments, such as BOP prisons, where people live, eat, and sleep in close proximity, face increased danger of contracting COVID-19, as evidenced by the rapid spread of the virus in BOP prisons. Indeed, the CDC has identified prisons, as environments that are especially susceptible to rapid outbreaks of infection due to close person-to-person contact among large, confined populations.

Spaces within BOP prisons are poorly ventilated; the lack of ventilation promotes highly efficient spread of diseases through droplets.

Prisoners and staff interact in close proximity under cramped conditions that are designed to confine people rather than distance them; as a result, BOP correctional facilities are highly susceptible to rapid transmission of the virus through contact,

including asymptomatic carriers who show no signs of illness, and common surfaces.

## IV

Absent significant de-densifying, people who are confined in BOP prisons, jails, and detention centers, as well as staff, will find it impossible to engage in the necessary social distancing and hygiene required to mitigate the risk of transmission.

One court, quoting another, recently summarized the problem: "Prisons are 'powder kegs for infection' and have allowed 'the COVID-19 virus [to] spread[] with uncommon and frightening speed,'" United States v. Salvagno, 5:02cr00051-LEK (N.D.N.Y. Apr. 23, 2020) (Doc. 1166 at 8) (quoting United States v. Skelos, No. 15-CR-317, 2020WL 1847558, at *1 (S.D.N.Y. Apr. 12, 2020)).

BOP Correctional settings increase the risk of contracting and spreading an infectious disease, like COVID-19 because they typically house high numbers of people with chronic, often untreated underlying health conditions, such as diabetes, heart disease, chronic lung and liver diseases, asthma, and lower immune systems from HIV. This chronic underlying illness, in turn, is often exacerbated by minimal levels of sanitation, limited access of personal hygiene, limited access to medical care, and no possibility of staying at a distance from others.

BOP Prisons are not isolated from communities, and infections in prisons give rise to the risk of "community spread." Even when prison visitors are reduced, staff, contractors and vendors go from prisons to communities and can bring infectious diseases into facilities and then into communities. The turnover of prison populations means that people cycle in and out, as well as transfer from one facility to another. Such movement creates an

ever-present risk that persons, including asymptomatic carriers, will carry the virus into and out of those facilities, spread infection, and trigger outbreaks inside and in communities. Prison health is an issue of public health as what happens in prison has widespread ramifications beyond the walls of the prison.

## COVID-19 Infection in the Prison Demographic Is Deadly

Many incarcerated individuals are at heightened risk of serious illness and death from COVID-19 because their demographic profile and histories make them part of a cohort that is especially vulnerable. People over the age of fifty face greater chances of serious illness or death from COVID-19. In a February 28, 2020, WHO-China Joint Mission Report, the preliminary mortality rate analyses showed that individuals age 60-69 had an overall 3.6% mortality rate and those 70-79 years old had an 8% mortality rate. For individuals 50-59, the mortality rate was 1.3%. For individuals age 40-49, the mortality rate was 0.4%, and for individuals 40 years and younger, the mortality rate was 0.2%.

**People of any age who suffer from certain underlying medical conditions**, including lung disease, heart disease, chronic liver or kidney disease (including hepatitis and dialysis patients), diabetes, epilepsy, hypertension, compromised immune systems (such as from cancer, HIV, or autoimmune disease), blood disorders (including sickle cell disease), inherited metabolic disorders, stroke, developmental delay, and asthma, are at elevated risk as well. The WHO-China Joint Mission Report provides that the mortality rate for those with cardiovascular disease was 13.2%, 9.2% for diabetes, 8.4% for hypertension, 8.0% for chronic respiratory disease, and 7.6% for cancer.

In many people, COVID-19 causes fever, cough, and shortness of breath. But for people over the age of fifty or with medical conditions that increase the risk of serious COVID- infection, shortness of breath can be severe.

25

Most people in higher risk categories who develop serious illness will need advanced medical help and support. This level of supportive care requires highly specialized equipment that is in limited supply, and an entire team of care providers, including 1:1 or 1:2 nurse to patient ratios, respiratory therapists, and intensive care physicians. COVID-19 can severely damage lung tissue, which requires an extensive period of rehabilitation, and in some cases, can cause a permanent loss of respiratory capacity. COVID19 may also target the heart muscle, causing a medical condition called myocarditis, or inflammation of the heart muscle. Myocarditis can affect the heart muscle and electrical system, reducing the heart's ability to pump. This reduction can lead to rapid or abnormal heart rhythms in the short term, and long-term heart failure that limits exercise tolerance and the ability to work. Emerging evidence also suggests that COVID-19 can trigger an over-response of the immune system, further damaging tissues in a cytokine release syndrome that can result in widespread damage to other organs, including permanent injury to the kidneys and neurologic injury. These complications can manifest

26

at an alarming pace. Patients can show the first symptoms of infection in as little as two days after exposure, and their condition can seriously deteriorate in as little as five days or sooner.  Even some younger and healthier people who contract COVID-19 are susceptible to severe strokes and may require supportive care, which includes supplemental oxygen, positive pressure ventilation, and in extreme cases, extra the need for care, including intensive care, and the likelihood of death, is much higher from COVID-19 infection than from influenza. According to recent estimates, the fatality rate of people infected with COVID-19 is about ten times higher than a severe seasonal influenza, even in advanced countries with highly effective health care systems. For people in the highest risk populations, the fatality rate of COVID-19 infection is about 15 percent.  Most people in high-risk categories who develop serious illness require advanced medical support, including specialized equipment, such as ventilators, and large teams of highly trained care providers, such as ICU doctors, nurses, and respiratory therapists.  The artificial ventilation process is itself invasive and dangerous, and some

27

patients must be placed in medically induced comas for such treatment. Given the need for advanced and urgent intervention, often in an ICU environment, people with severe cases of COVID-19 cannot be shackled or otherwise restrained, nor can they be subjected to constant, close supervision by correctional staff, as they would be in a typical correctional setting. BOP prisons are not equipped to provide advanced support in an ICU setting with ventilators, certainly not for a substantial group of seriously ill prisoners who may require such specialized care. Patients who do not die from serious cases of COVID-19 may face prolonged recovery periods, including extensive rehabilitation from neurologic damage, amputation due to clotting and reduced blood flow, loss of respiratory capacity, and tissue damage in other vital organs, including the heart and liver. In sum, to buffer against the outbreak of a highly infectious, deadly virus in a closed detention setting requires urgent and decisive action to protect the health of those confined in the prison, those who work there, and the medical professionals who will treat those who become infected.

28

## THE SPREAD OF THE COVID-19 IN BOP FACILITIES REQUIRES DE-DENSIFYING AND PROVIDING SOCIAL DISTANCING FOR INMATES WHO REMAIN IN BOP PRISONS DEATH TRAPS.

I

Available statistics reveal a public health disaster erupting across BOP facilities that worsens with each passing day. From March 20 to April 25, confirmed COVID-19 cases among BOP prisoners and staff rose from 2 to 1047. Since April 25, that rate has more than doubled. Severe outbreaks at BOP prisons already have resulted in hundreds of confirmed COVID-19 infections among prisoners and staff, many more suspected but unconfirmed cases, and many prisoner deaths throughout the system. That surge of COVID-19 cases inside the federal prison system has dwarfed the national percentage increase in confirmed cases over the same time period. According to CDC guidelines, only two measures are known to be effective in reducing the spread of this disease: (1) diligent "social or physical distancing," which involves keeping at least six feet of space between people to avoid transmission of the virus, and (2) vigilant hygiene practices, including frequently

29

washing hands and regularly disinfecting surfaces. Physical distancing is a necessary predicate for hygiene practices to have any meaningful impact. Because asymptomatic or pre-symptomatic people can transmit the virus to others, it is critical to follow CDC guidelines, including social distancing, even among people who show no signs of COVID-19 and appear to be healthy.

## II

The only effective way to minimize the potential devastation from COVID-19 in BOP facilities generally, and at Defendant's prison in particular, is to downsize immediately the incarcerated population and, for the prisoners who remain at the institution, to undertake aggressively the detection, prevention, and treatment measures that public health and medical experts have recommended, including effective social distancing. These measures are not possible in BOP prisons, without substantial reductions in the prisoner population. What some officials call "modified lockdowns" are not what self-quarantining and social distancing entails. Prisoners and staff interact in many ways, and when

30

facilities have dorm-like arrangements, prisoners sleep, eat, congregate, recreate, and receive medical treatment in close proximity. Implementation of necessary hygiene practices is also impossible, particularly when adequate supplies of free soap, sanitizers, disinfectants, and paper towels are not readily available in prisons. Correctional public health experts have recommended the release from custody of people most vulnerable to COVID-19 so as to protect them and permit risk mitigation for all people held or working in facilities. Release of the most vulnerable people from custody also reduces the burden on the region's health care infrastructure by reducing the likelihood that an overwhelming number of people will become seriously ill from COVID-19 at the same time. Diseases in prison put staff and surrounding community at risk. When the COVID-19 virus is introduced to a prison, all persons within the facility – whether they are staff or incarcerated people – are at heightened risk of contracting the virus and, in turn, spreading the virus to others with whom they live or come into contact with in their own homes and neighborhoods. The harm caused

by a COVID-19 outbreak in a correctional facility, therefore, is not confined to those who are incarcerated or work in that facility. Instead, this harm poses a serious health risk to the surrounding community on which Petitioner class needs to rely for health care as well as for general services through staffing of BOP.

III

Without social distancing measures, reliable containment of a highly contagious disease is nearly impossible. This makes transfer to home confinement or compassionate release, the only viable measure by which the safety of highly vulnerable inmates can be reasonably assured. Even with the measures that the BOP has put in place, due to the impossibility of adequate social distancing, confinement at any BOP prison, and at Defendant's prison—due to the very structure of the facility—continues to pose a grave risk to vulnerable inmates' health, and death. Under the circumstances of the present crisis, the BOP's failure to make prompter, broader protections for the lives of vulnerable inmates constitute deliberate indifference, and death traps.

32

# IV

Diseases in BOP prisons put staff and surrounding community at risk. When the COVID-19 virus is introduced into a prison, all persons within the facility – whether they are staff or incarcerated people – are at heightened risk of contracting the virus and, in turn, spreading the virus to others with whom they live or come into contact with in their own homes and neighborhoods. The harm caused by a COVID-19 outbreak in a correctional facility, therefore, is not confined to those who are incarcerated or work in that facility. Instead, this harm poses a serious health risk to the surrounding community on which Defendant class needs to rely for health care as well as for general services through staffing of BOP. Without social distancing measures, reliable containment of a highly contagious disease is nearly impossible. This makes transfer to home confinement or compassionate release, the only viable measure by which the safety of highly vulnerable inmates can be reasonably assured. Even with the measures that the BOP has put in place, due to the impossibility of adequate social distancing,

33

confinement at any BOP prison, and at Defendant's prison—due to the very structure of the facility—continues to pose a grave risk to vulnerable inmates' health, and even death to the prisoners. Under the circumstances of the present crisis, the BOP's failure to make prompter, broader protections for the lives of vulnerable inmates constitute deliberate indifference, creating death traps, in violation of the laws and Constitution of the United States.

## V

For inmates in our country's prisons the COVID-19 virus is a major threat, and distancing measures are only minimally or not available. Despite BOP's efforts, BOP officials are fighting a losing battle. A losing battle for staff. A losing battle for inmates. The BOP has hundreds of confirmed cases of COVID–19 among its prisoners. The number of infected staff members is almost as high. The numbers have risen every day since the BOP commenced some limited form of protections for the inmates.

34

Recent experience at BOP's prisons shows how quickly and insidiously the virus spreads among a tightly quartered prison population. Once the virous is inside the prison, screening measures can only be of minimal effective. And screening will only help to identify individuals with active symptoms, not those asymptomatic individuals who can nevertheless spread the virus undetected. Furthermore, while the deteriorating health conditions at BOP prisons pose a danger for each of the thousands of prisoners who are incarcerated by the BOP, the BOP's inability to stop the spread of the virus among the inmates in its care poses an even greater risk for inmates whose medical conditions put them at higher risk of death if they contract the virus.

## VI

State and Federal governments and the media have well documented the spread of COVID-19 and the efforts to contain the virus and limit its impact. The virus's highly-infectious nature and the risks it poses, especially to medically vulnerable populations, has led to the

35

implementation of unprecedented measures throughout the country and the world.

While research concerning the virus is ongoing, for some time health officials have known and reported that asymptomatic persons spread the virus. A large percentage of coronavirus-infected citizens are asymptomatic. These asymptomatic persons show no, or limited, symptoms. Yet, they spread the virus.

Due to this threat from infected but asymptomatic individuals, testing, tracing and treatment became the first mitigation responsibilities. As the virus has become more widespread, state and federal governments have directed citizens to reduce the spread not only through careful hygiene practices, but also through social distancing and isolation. Unfortunately, not every person can quarantine or self-isolate, including individual who are serving a sentence in the BOP. Not only are these people stuck in crowed facilities by the BOP where the coronavirus spreads from inmate to inmate, or from staff to inmate. Recent reports indicate that the BOP is woefully underprepared to deal with the

36

outbreak of the coronavirus. In fact, many BOP staff have already tested positive for COVID – 19 after interacting with inmates. Thus, BOP staff themselves are a great threat to prisoners.

## REQUIRED-MANDATORY DUTIES OF FEDERAL BUREAU OF PRISONS

Under 18, U.S.C. Section 4042(a)(2) and the **Eighth Amendment**, prison officials must "ensure that inmates receive adequate food, clothing shelter, and medical care, and must take reasonable measure to guarantee *the safety of the inmates*." Farmer v. Brennan, 511 U.S. 825, 832 (1994).

## Duties of Bureau of Prisons 18 U.S.C. Section 4042

**(a)**—The Bureau of Prisons, under the direction of the Attorney General, shall—**(2)** provide suitable quarters and provide for the safekeeping, care, and subsistence of all persons charged with or convicted of offenses against the United States, or held as witnesses or otherwise. 18 U.S. Code § 4042. Prisoners have a right, in other words, to "humane conditions of confinement." **Farmer 511 U.S.**

**at 832**. "[H]aving stripped [incarcerated persons] of virtually every means of self-protection and foreclosed their access to outside aid, the government and its officials are not free to let the state of nature take its course." *Id.* at 833.

I

This case is about the BOP being unable to fulfill its obligations under the Eighth Amendment and federal statue, 18, U.S.C. 4042(a)(2), to provide Defendant with suitable quarters and provide for his safekeeping, care, and substance. The **Fifth Amendment's** Due Process Clause forbids the BOP to change Defendant's sentence, to a death sentence, and the **Eighth Amendment** forbids cruel and unusual punishment. The BOP is bound by 18 USC Section 4042 (a) (2), and by the **Fifth** and **Eighth Amendments** to the Constitution of the United States.

II

Title 18 USC Section 4042 (a)(2) demands that the BOP provide

suitable quarters and provide for the safekeeping, care, and substance of all persons charged with or convicted of offenses against the United States. The **Fifth Amendment** forbids the BOP to change Defendant's punishment to a death sentence, while  the **Eighth Amendment** forbids cruel and unusual punishment; and forbids the BOP to house Defendant in conditions which will, or could, kill him, or that would expose him to the COVID-19 virous, causing him extreme sickness or even death.  The BOP simply cannot meet the mandated requirements of 18 USC Section 4042 (a) (2), and  the **Fifth** and  **Eighth Amendments** to the Constitution of the United States. The Due Process Clause of the **Fifth Amendment** forbids the BOP  to confine Defendant in conditions outside the intended sentence (punishment) intended  by  his sentencing judge. The Due Process Clause of the **Fifth Amendment** forbids the BOP from changing a judge's specific sentence, to a death sentence.

Under the  circumstances, and facts, and law presented herein, confinement of Defendant in a BOP facility,  could be, or would be, a death sentence.

39

Defendant falls within the "zone of interests" of 18 U.S.C. § 3582(c)(1)(A)(i), and Section 4042 and the Fifth and Eighth Amendments.

## III

Under 18, U.S.C. Section 4042(a)(2) and the **Eighth Amendment**, prison officials must "ensure that inmates receive adequate food, clothing shelter, and medical care, and must take reasonable measure to guarantee the safety of the inmates." Farmer v. Brennan, 511 U.S. 825, 832 (1994. The Bureau of Prisons, under the direction of the Attorney General, shall— (2) provide suitable quarters and provide for the safekeeping, care, and subsistence of all persons charged with or convicted of offenses against the United States, or held as witnesses or otherwise. See **18 U.S. Code § 4042 (a) (2).** Prisoners have a right, in other words, to "humane conditions of confinement." Farmer 511 U.S. at 832. "[H]aving stripped [incarcerated persons] of virtually every means of self-

protection and foreclosed their access to outside aid, the government and its officials are not free to let the state of nature take its course." *Id.* at 833.

## THE BOP HAS CLEAR AUTHORITY TO PLACE PRISONERS ON HOME CONFINEMENT

I

**18 U.S.C. Section 3621** (b)PLACE OF IMPRISONMENT.—The Bureau of Prisons shall designate the place of the prisoner's imprisonment, and shall, subject to bed availability, the prisoner's security designation, the prisoner's programmatic needs, the prisoner's mental and medical health needs, any request made by the prisoner related to faith-based needs, recommendations of the sentencing court, and other security concerns of the Bureau of Prisons, place the prisoner in a facility as close as practicable to the prisoner's primary residence, and to the extent practicable, in a facility within 500 driving miles of that residence. The Bureau shall, subject to consideration of the factors described in the preceding sentence and the prisoner's preference for staying at his or her current facility or being transferred, transfer prisoners to facilities that are closer to the prisoner's primary residence even if the prisoner is already in a facility within 500 driving miles of that residence. The Bureau may designate any available penal or correctional facility that meets minimum standards of health and habitability established by the Bureau, whether maintained by the Federal Government or otherwise and whether within or without the judicial district in which the person was convicted, that the Bureau determines to be appropriate and suitable, considering—

18 U.S.C. Section 3624 (c) Prerelease Custody.—

(1) In general.—The Director of the Bureau of Prisons shall, to the extent practicable, ensure that a prisoner serving a term of imprisonment spends a portion of the final months of that term .... , under conditions that will afford that prisoner a reasonable opportunity to adjust to and prepare for the reentry of that prisoner into the community. Such conditions may include a community correctional facility.

41

(2) Home confinement authority.—The authority under this subsection may be used to place a prisoner in home confinement ....

(3) Assistance.—The United States Probation System shall, to the extent practicable, offer assistance to a prisoner during prerelease custody under this subsection.

Pursuant to 18, U.S.C. Sections 3621(b), and 3622 ,and 3624 (c ) (2) and (3), and the **First Step Act**, and the **CARES ACT,** and the **Coronavirus Aid, Relief, and Economic Security Act,** Pub. L. No. 116-136 Section 12003(b)(2), the BOP has authority to place prisoners (Defendant) on **home-confinement** at any time. The Warden has another source of authority he or she may use to remove medically vulnerable inmates from the dangerous environment at Defendant's prison, and at the same time reduce the density within the prison for all inmates. Unfortunately, the record in this case makes clear the Warden, or the BOP itself, are not making adequate use of that authority either. Specifically, neither the Warden nor the BOP as a whole is implementing 18 U.S.C. Sections 3621(b), and 3624 (c ) (1), (2) and (3), and Section 3582(c)(1)(A), and Coronavirus Aid, Relief, and Economic Security Act, Pub. L. No. 116-136 Section 12003(b)(2), in the way Congress intended when it adopted

those statutes, and the **First Step Act**, and neither has made any noticeable effort to update the process for evaluating home-confinement, and "compassionate release" requests to take account of the COVID-19 pandemic. For the medically vulnerable inmates in BOP prisons, this failure shows deliberate indifference in violation of the **Eighth Amendment**.

## II

The BOP Wardens handling 18 U.S.C. Sections 3621(b) and 3624 (c) (1), (2) and (3), and Section 3582(c)(1)(A), and Coronavirus Aid, Relief, and Economic Security Act, Pub. L. No. 116-136 Section 12003(b)(2), concerning **home-confinement**, and or "compassionate release" requests under Section 3582(c)(1)(A), amounts to deliberate indifference.

The Bureau of Prisons has statutory authority to transfer prisoners to home-confinement under 18 U.S.C. § 3621 (b), and 3624(c)(2) and 34 U.S.C. § 60541. ECF No. 24-2 at 18. Under 18 U.S.C. § 3621 (b) and

3624(c)(2), and Coronavirus Aid, Relief, and Economic Security Act, Pub.

L. No. 116-136 Section 12003(b)(2), the Bureau of Prisons may "place a

prisoner in home-confinement, and Under 34 U.S.C. § 60541, the BOP

may release some or all eligible elderly offenders and eligible terminally

ill offenders from BOP facilities to home detention, upon written request

from either BOP staff or an eligible offender.

The **CARES ACT** and **The First Step Act** has given the Bureau of

Prisons explicit authority to place *any* inmate on home-confinement, and

the Attorney General has made the emergency findings triggering that

authority. He has also directed the Bureau of Prisons in urgent terms to

"immediately review *all* inmates who have COVID-19 risk factors, as

established by the CDC. His April 3, 2020 memorandum could not have

conveyed a greater sense of urgency, instructing the Bureau to "begin

implementing this directive immediately at the facilities I have

specifically identified," noting that "time is of the essence," and asking

for implementation "as quickly as possible." *Id.* at 49.

# III

In spite of the explicit statutory authorization in the **CARES ACT** to make widespread use of home-confinement in response to the threat posed by COVID-19, and the exhortations of the head of the government department in which the Bureau of Prison sits, the implementation of this directive at Defendant's prison has been slow and inflexible. In short, by failing to make meaningful use of the Warden's home confinement authority, the Warden has failed to implement what appears to be the sole measure capable of adequately protecting vulnerable inmates—a measure the Attorney General directed the BOP to implement "immediately" and with "dispatch"—in favor of measures that, even if they were fully and painstakingly implemented, would still leave vulnerable inmates subject to a grave risk to their health. The Warden has disregarded a "substantial risk of serious harm" by "failing to take reasonable measures to abate it." Farmer, 511 U.S. at 847. While the Warden is free to exercise discretion in choosing among equally

effective measures to protect inmates from serious risks, choosing inevitably inadequate measures to the exclusion of a plainly superior one constitutes deliberate indifference. *See, e.g.*, Chance v. Armstrong, 143 F.3d 698, 703 (2d Cir. 1998).

## CONCLUSION

 After Defendant's confinement, the loss of his freedom, and facing imminent grave illness or death, Defendant is prepared to walk humbly in this world.  He respectfully requests that the Court grant this motion and re-sentence him to a sentence of imprisonment of time-served or, alternatively, a sentence of **home-confinement** for the remainder of his sentence followed by a term of supervised release not to exceed the balance of his original prison sentence.   Should the Court require additional development of the record before it rules on this motion, Defendant  requests that it conduct an emergency evidentiary hearing to determine the extent of the health and safety crisis at BOP prisons. Defendant requests that the warden and medical director of the BOP facilities, as well as Defendant, be available to testify at any hearing.

46

# RELIEF REQUESTED

**For the above facts and reasons**, Defendant respectfully request

this Honorable Court for the following:

a.  Require the United States Bureau of Prisons to answer each of the above facts and claims within 20 days;

b.  Require the United States Bureau of Prisons to produce for this Court's inspection and consideration, medical records; along with the number of prisoners (not the names just the number) who have contracted, and who now at the present time have the COVID-19 virus;

c.  Hold a full and meaningful hearing on each of the above facts and claims;

d.  A Declaratory judgment declaring that  BOP prisons are death traps for Defendant and other prisoners;

47

e.  In considering Defendant's facts and claims, consider a resentencing, and/or any and all  means for placing Defendant on home confinement, or community half-way house, and or supervised release;

f.  In considering Defendant's facts and claims, consider ordering the BOP to fully comply with its duties as set forth above;

g.  In considering Defendant's facts and claims, consider directing the BOP to meaningful consider,  and to place Defendant on home-confinement monitoring, or half-way house, or other housing free of the COVID-19 virous;

h. Due to the seriousness of this case, and the effect it will have on Defendant and all other prisoners, appoint counsel in this case;

i. If the Court finds this motion is in the wrong court, then transfer the case to the proper court;

j.  Grant Defendant any and all other relief he may be entitled.

Pursuant to 28, U.S.C. Section 1746 under penalty of perjury, I declare that the above information is true and correct to the best of my information and ability.

**Dated:**   November 3, 2020

Alan Boyd Don Barnett
Pro se Defendant
#27497-058
FMC Bunter
P.O. Box 1600
Butner, N. C. 27509